Good morning. My name is Jim Boren. I'm Douglas Barnes' lawyer. I was in 2001 when this case was tried. And I have a couple of things just to start with. I think that it is important to understand what the theory of the defense was at the time of the trial in 2001. Douglas was 19 years old and he and 15 to 20 other young people went to a park to have a fight. That would have been called a rumble at some point in time. In my time, when I was 19 years old, I wasn't looking for a fight. But apparently when I was out on a Friday night, that was not the case in 2001 with these kids. The theory was that there was a fight and that there was a consent. There wasn't a battery or a prosecutable crime because the people voluntarily agreed to a fight. Therefore, if the injuries occurred during the consensual part of the fight, then there was not a crime because Mr. the fight progressed in two different phases. One was the big fight when everybody was fighting on what we call the parking lot. And then on the other side of the rail, Lance Idell, who had been injured and hurt in the fight, was picked up by two of his friends and was taken to what we call the other side of the rail. And on the other side of the rail, that's where the rubber met the road in the fight in the trial. Who was on the other side of the rail and what happened? Because Brewer, Barnes, and Ortega go to their car, tires flash, they're really angry, they come back. Correct. And Hill's with Idell, but eventually he runs. Well, that's where the story differs. They all came back and the question was who at that point was engaged in the fight with Idell, particularly after he fell and was down on the ground and was incapable of resisting or fighting. At that point, we all agreed there's no consent. You can't beat up somebody who's on the ground. And the real battle was there were two people who testified as to they were there on the Idell side, if you will, Mr. Babineau and Mr. Casamini, and their testimony was as to who was involved in the fight. Was it Ortega and Brewer and Barnes or was it just Ortega and Brewer? So that was the theory of the defense, who did what and when. What I have learned is that every single different lawyer who reviews this case has a really good argument as to what happened depending upon which portion of the testimony you cite in your brief. It was a chaotic fight and the record of what happened at the trial, there's a trial that was eight days long, lots of witnesses testified, and you can make a good argument as to what happened from selectively spinning the case as I do and as Mr. Lee. Casamini, I know your time's just ticking. Casamini recants. Yes. And we've all read that hearing. That was late. That was the first thing that happened and this is the second thing. Am I right that even if we get to the merits, which sort of collapse with the cause and prejudice on Casamini, even if we can get there past the bar, ultimately it turns on that last paragraph being material Giglio, right? Yes. Okay. And how do you, what's the best case? We spent the whole week dealing with Brady Giglio. It's tough, but if another ADA that isn't the prosecuting ADA just says, Hey, you're commended for, for being, for telling the truth. And I've seen your first offender. So you're going to get low. You're probably going to get low. Where's the material Giglio on that? How do you, I mean, you're well, it depends on when that happened. It depends on whether that happened to before he testified or, or after he testified. Even if it's before, how do you use that to impeach? Cause he, well, because he testified at trial that he had no discussion with any prosecutor prior to the time of his testimony about a, about a deal or a benefit. Okay. No, you're understanding. I may be, I guess I'm looking for a Giglio case cause, cause what she says isn't a deal for him. She's saying you're a first offender. You're going to get off. And she's not his prosecutor. She's not. In fact, he disclaims the Ortega affidavit, which did describe a deal. He says that, that was a lie. And he takes the second one. So that paragraph is pretty mild. I know you'll disagree, but what's a good Giglio case where that's a benefit. That's a very fair question. And I, and I, and I know I need to have a good answer for that. And the answer is, you know, each one of these witnesses would say one thing on direct and then on cross examination, they would take away from it. Well, I didn't really see him or I didn't do this now. Casa Mimi, when he testifies, there's two parts. One is the recantation, which is completely consistent with our theory and which of course no one has ever ruled upon whether that comes in because of the time bar. But what your focus is, I think is on the last paragraph of Casa Mimi affidavit. Does that constitute Giglio? And, and Mr. Casa Mimi at the trial says, I never had any conversation with the prosecutor about this. They never gave me any help. They weren't the prosecutors. I was charged with an armed robbery and with a, I believe it was a gun charge in federal court, two different charges, which carried substantial time. And he got a very, very light sentence. Now, had we known that the prosecutor had said, you know, you're a first offender. I'm going to see if I can help you get a lighter sentence or something like that. We would have cross-examined Casa Mimi about that, but we were not aware of it. In fact, we weren't aware of it until 2008 when we went up and visited with Casa Mimi. So, I mean, it's a question of how skillful the cross-examination would be on Casa Mimi. Those little things can be, you know, in a close case where the needle is right in the center, one thing or another can push it one way or another. I was the trial counsel. I didn't handle the appeal. I got back involved in the case pro bono until it got here, at which point I asked to be appointed by the CJA because I was familiar with the case. I want to hold that thought if I can. In 2013, the Louisiana legislature changed Louisiana's law. We became the 50th state to discover, to require discovery of witnesses' statements in advance of trial. In 2001, the rule was you don't get police reports. You don't get witness statements. You only get what the government says is Brady, and they turn that over to you. And so what happened was that we did not get any of the statements. Our position was discovery is not to be conducted during trial. What you do in trial is you work upon the facts that you have, which goes to the Hill statement. And the other thing I want to point out is that we raised, in 2004, I filed the first, what is called in Louisiana, a shell petition. I'm sure you're familiar with it. And it's like, we don't know anything about this case, but we believe, and one of the paragraphs in the shell petition was that the state has not provided us with Brady material and Giglio material. So the very first time that we appeared, we said, but we don't know what that is yet because we're just now discovering. The only way you get discovery is you get convicted, you go to prison, you lose your appeal, and then you get a right to file a public records request, and that's when you get all of the discovery. So that's when you learn all of this up until now, up until 2013. That was the position that a defendant is in is this. He has to say, look, this statement that I got, had I gotten it before, I would have done this, that, and the other with it. There's a chart, the only thing... Remind me just quick on the Hill statement. In some ways, it's simpler because we don't go through the procedural bar issues, but that statement, you didn't receive in any format? No. Or you did get it, but you didn't get the synopsis and the recording, but you got something else. Correct. We got a police report. No, we did get a report that said that a statement was made. We did not get the statement. It wasn't until 2005, after our petition had been filed and was pending for a year, that we finally extracted from the sheriff's office this recording of Hill. And there's an important exhibit. I don't think that I noted it in the brief, but I think that would be helpful for you to review. We filed an objection to the commissioner's finding in state court, and that was in 2005. And there's a chart that we put together showing what Hill's nondisclosed statement said and what his trial testimony said. And I only commend that to you to tell you that those are the issues that would have been developed on a cross-examination. And I also note, as regarding the Hill statement and the significance of it, is that Judge Anderson, who was the presiding trial court, relied almost exclusively on the Hill testimony to say that Douglas Barnes was a principal to this crime. So Allen Hill's statements and testimony were, in our view, critical. On the Hill part of it, one of the challenges you face is that the state court did rule on that on the merits and said that it wasn't material. And so we have to view that through this deferential lens of having to find that the state court was unreasonably applying the law in saying it was not material. Are there any cases under AEDPA you can point us to similarly where a Brady materiality or lack of materiality finding was made by the state court and we said that was unreasonable? I would start with Kyles versus Whitley because that is not the analysis that was used by the state court magistrate, I believe. I think they improperly applied federal law and they improperly reviewed the facts. Kyles versus Whitley says that you cannot take a prior inconsistent nondisclosed statement and view it in a vacuum, that you have to look at the totality of the circumstances. And so if you look at the totality of the two primary witnesses were Cosimini and Hill, and now that one has recanted and provided information about a deal and the other one has testimony that was inconsistent, the entire package should be rather than just the Hill statement. And if a state magistrate judge says this turtle is actually a frog, then I don't think that that, you know, there is some limits to an analysis of the facts. And her written reasons, magistrate, I don't remember if it's Pitcher, Magistrate Morgan, Magistrate Pitcher Morgan was her name. Her statement, her allegation about the facts is just clearly inconsistent with a lot of the testimony. So my argument, the call that I retreat to, is that the to avoid the, to try to defeat the deference that is properly accorded to state courts is that an improper standard was used. But that's only if the Cosimini Brady material should have also been considered. Exactly. In the state court, they didn't consider it on procedural grounds. And where we are on Cosimini is that nobody has ruled on the relevance or Brady notion. It's been ruled time barred and it's not relating back, which is why I point out that the 2004 petition says generically, just for this reason, because we know in Louisiana, you don't find out what happened until years and sometimes a decade later when you finally pry out the statements from the law enforcement agencies through public records requests. I'm sure it must be frustrating to you, but in the end, with maybe not much reasoning, Anderson, First Circuit, Supreme Court all say procedural bar. Have you ever been able to understand what they see the basis for that? Well, they don't give any reasons for that at all. They simply say procedural bar. And, you know, I know that that's entitled to deference, but to me, that is a conclusion. And I would also say that the federal magistrate, Riedlinger, when granting the dismissing claim or recommending our claim be dismissed for the procedural bar vis-a-vis Cosimini, did not talk about equitable tolling at all, which means to me that your — What's your best case on equitable tolling? This would be — De novo. It's a de novo review. It seems compelling. Even if you didn't ask Brady to amend, it seems a fairly compelling equitable tolling case, can you — to me. But can you help me with a law that would support that? We argue to the court over the vigorous and well-put arguments of Dale Lee that, look, this is the spot we're in, Your Honor. Here's Douglas Barnes' options. He can try to proceed in federal court with the most likely ruling being that you did not exhaust your remedies in Cosimini, or we can stay in jail for another year or two, which turned out to be many more years in jail, while we try to litigate it in state court and put it all together so that the Cosimini-Hill case can be heard together. And that's what we plan to do. And they objected. And the judge said, I'm sending it back. I'm going to let you do that. They didn't appeal and say, hey, Fifth Circuit, this is not the right way to do it. If you get equitable tolling, you've still got to establish cause and prejudice, right? I do. I do. It's — there's a lot of moving parts. Yeah. I'll give up my five — if you have more questions, I want to answer them rather than spend my time on rebuttal. I like to have rebuttal. You know, we don't get — Your answer to the — well, the no prejudice, which is going to be coming at you in a minute, is, well, there were a lot of eyewitnesses, but not to the second portion? Correct. That's your answer? That's correct. And one of them has recanted, and the other one is severely discredited. Hill, whose story is — before Lance gets up and runs to the other side of the railing, that's where — that's where he saw the fight. Thank you. Okay. Thank you, Mr. Bourne. Mr. Lee. And you've been with this case as long, right? Just about, Your Honor. I've handled the appeal, the post — state post-conviction, the federal habeas, so I've been on it basically since the conviction. I didn't actually try the case in Baton Rouge — allow me to introduce myself. My name is Dale Lee. I'm an assistant DA in Baton Rouge. I work in our appellate section, so basically I do the appeals, post-conviction, federal habeas. So I've kind of worked on it since then. I kind of look at the case a little different, I guess you might imagine, in that we have two problems here. You know, trying to jump ahead and talking about Kosamini is kind of, you know, putting the cart before the horse, as far as I'm concerned, because in this case, we — everything related to Kosamini is procedurally barred. So if you look at the way counsel, you know, did his brief, he basically tried to couple the arguments together and make them look like he'll and Kosamini work together and that the court can consider those together. But I maintain that they can't. I spent a lot of time looking at the state court rulings, and what's the — what is the procedural bar? On the state post-conviction relief relating to Kosamini specifically. Was it excessive on time? Both. The federal district court found that — The commissioner didn't see it that way at all. The commissioner — and again, in Louisiana, commissioners are a little bit different than magistrate judges. They're not the equivalent of an Article III judge. They're entirely hired by the court. They have no adjudicatory power. Basically, they write — You were at that hearing with the commissioner. Yes, sir. And by the very end, you're — you aren't pressing procedural bar yourself. You're sort of saying, in fact, due diligence doesn't seem to be part of the rule. In which hearing? In the state hearing? In that first state hearing after it came back. As I recall, what we were arguing there was the question whether or not the due diligence had been sought in finding the alleged new evidence. After we had that hearing before Commissioner Smart — I don't believe it was Commissioner Morgan. I believe it was Commissioner Smart. When we had that hearing, the question on the table was, did counsel act diligently in looking for that evidence, or did he need to act diligently?  have a hearing on the merits of the Cosimini claim, we filed what's called a traversal, basically an objection to the commissioner's recommendation. And Judge Anderson signed an order saying that he found the claim to be repetitive and or untimely. Now, in repetitive, repetitive is more than just that it's been filed before. It could be could have, should have, would have. If you look at 930.4 in Louisiana, it could be repetitive if you could have raised this sooner or you should have raised it sooner. There was an objection of trial, and you failed to raise it sooner. I mean, there's like four different subsections to our repetitive article. But there's no way they could have known about the encounter with the ADA. How could that — how any due diligence? They wouldn't know what another district attorney said in the hall to a lead government witness. The allegation in the Cosimini affidavit, which I maintain is not part of our record at this point, but the allegation in the — in the Cosimini affidavit was that Tracey Barbera was the one that spoke to Cosimini, and she was the — I just don't see a State procedural bar. What's — instead of saying it's both untimely and repetitive, tell me which is the better basis. Well, repetitive, I mean, it depends on how you view it. I mean, repetitive would be the better one, because repetitive is the one that says that you should go out and seek out your claims and try to bring all your claims in one claim. For instance — How can they seek out the fact that a government prosecutor talked? All it would have taken — what occurred in this case — The recantation, yes, but — okay. Let me — I'm not being clear. Where — because since the courts, all three levels that I looked at, didn't elaborate which the bar and the basis behind the bar. I'm guessing you gave the State habeas court system the best procedural argument. So in the record, where do I see the underlying reasoning behind the repetitive statement barred? Where will I find it? I believe that's probably going to be in our brief. Sorry. I guess so. The commercial that we made to the district court. Okay. And you wrote that. And so what was the reasoning? We argued that these are claims that could have been brought before, had the — as part of the post-conviction process, it's incumbent upon post-conviction counsel to look for claims. Had they interviewed Cosimini at that time, he may or may not have said, you know, done his recantation. We don't know. I agree. The recantation's on them, right? And they go to them, independent of you. They do. And belatedly, maybe. But you would never — Belatedly is what gets you barred in State court. Yeah. But you wouldn't have known what the government had to disclose to begin with, which is, we may or may not have made a promise to our lead witness, the guy that gets him on the second assault. But if you don't ask the question, then you never get there. But who's going to ever ask something that they're owed constitutionally? Well — They wouldn't think I got to ask, did they make a promise they didn't disclose to me. Well, apparently, they did in this case. I mean, I don't know exactly how the evidence came up. I mean, supposedly — That's your answer, that it's procedurally barred when the government might have a Giglio-McBrady initial duty. They have to find it, even though you had a constitutional duty turned over? No, sir. Well, first of all, again, we haven't argued the merits of the Cosimini affidavit. So we haven't put any witnesses on the stand. I believe the entire thing to be false. But our argument below — But Cosimini was on the stand. You had full access — At trial, yes, sir. And I believe the question was asked, if I'm not mistaken, at trial. And he denied that any claims that anybody had made him any promises, if I'm not mistaken. So the recantation, which came later, was news to everyone, including the State. So you're presupposing that the State must have — on the — on his credibility as the recantation at all. I don't remember a single question of yours saying — Well, not of us. I mean, of the defense, if I'm not mistaken. But it's been a while since I've read the trial court record. But again, we maintain that it never happened. We haven't gotten to the merits on that, so we've never had any witnesses that have testified on it. What's the best Supreme Court decision I can read that is as similar as possible to a procedural bar applying here, just to give me a case? Most of them, you don't — well, until recently, you haven't gotten a lot of Supreme Court decisions written on — What about the appellate level? Post-conviction cases, sir. Appellate-level decisions. You don't have a whole lot there. I mean, with post-conviction — So there isn't a good case? Sir? So there isn't a good case that you can give me now? Primarily, we end up doing it on writ practice. And a lot of times, in writs, all you get is, you know, the one or two word, writ denial. So, you know, unless you read the underlying briefs, you don't know what was contained in that record except for the writ denial. That's one thing that both sides have complained to the Louisiana Supreme Court, among others. And Mr. Bourne and I have both been on various committees recommending to the Louisiana Supreme Court that they need to give us more information in their writ denials and post-conviction actions. And so, you know, we've tried to do that. But in this particular case, though, again, you know, the State District Court found that it was repetitive. It should have been raised earlier. I'm assuming that's the repetitive bar. That's the repetitive bar, I argue. The District Court judge did not give us a lot of reasoning whenever he did that. He just found that it was repetitive and time-barred. Time-barred is obvious. It's more than two years after the fact, you know, and the judge either didn't buy that it was newly discovered evidence or he believed that it was evidence that wasn't diligently pursued. Again, he didn't give us any details. That was my argument below. And I'm assuming that's what the Court found, but I can't, you know, I can't tell you that because the Court didn't say that. But in the Federal court, when you're dealing with a habeas petition and you're looking at what occurred in the State court, what occurred here was it was procedurally barred. So the whole Cosimini claim … Roberts. The State court individual that looked at it, the Commissioner, didn't agree with that. Every other court said it, but they never articulated a reasoning behind it. I believe the district court's order did articulate that, if I'm not mistaken. It states it. It doesn't apply. Okay. Well, that was the judge's ruling. He didn't provide reasons for that ruling, I guess, is what you're saying. Okay. You're right. And, you know, again, in Louisiana, judges aren't necessarily required to give reasons for their ruling. But I think if you look at all of the habeas cases, including, you know, the lineage that we go through all the time, we talk about Cullen, we talk about Harrington v. Richter, we talk about all those cases that come out of California in the Ninth Circuit, most of those were mere writ denials. And so the Court says basically … and they was related to the merits. You're right. The magistrate picks up on it. Judge Brady, who looks at these things closely, picked up on it, too. Right? Right. But when you're dealing with the procedural objection, though, the rule in Federal court is, if it's a procedural objection that was maintained in State court all the way up, then when we get to Federal court, we have an independent and adequate State law bar. And that's what we maintain we have in this case. And whether we amend it or not … But that's not what the District Court relied on. The District Court relied on the timeliness issue. Correct. Well, on the Federal timeliness issue. Right. And we argued below that it was an independent and adequate State law bar anyway. And then what I maintain is, even if you rule on the timeliness issue under Federal law, we still have to go back and deal with the independent and adequate State law bar. And if one of the cases that have come out since we briefed this and since we argued this was a case out of this Court, I believe, bad on pronunciations, I believe it's Ayestas, A-y-e-s-t-a-s. And in Ayestas, let me find the site here, it's 817 Federal 3rd, 888, and I believe it was decided in December. Basically, in that case, you had a motion for a stay-in-a-bay type situation where an individual wanted to go back to District court and raise a new claim. And basically, this Court reviewed it and said if you go back to State court, you're going to be time barred. If you're time barred, it's an independent and adequate State law bar, so when you come back to Federal court, you're going to lose. So in that case, the Fifth Circuit basically refused to grant the stay-in-a-bay, refused to grant the Certificate of Appealability, and said because if you go back, you're still going to lose. And we maintain that that's essentially what has happened in this case. Kennedy. Did you address the argued that before the District court when it granted its stay, the Federal District court? That is not Ayestas. This was a new case. Kennedy. No, but I'm sorry. That argument that it would be barred when it came back. Yes. What we argued before the District court, he was considering the stay-in-a-bay procedure, and we said, well, Your Honor, basically what we have here is you have the original claims that were filed in the petition, but the Cosimini claim had not been filed, okay? Nothing had been filed to amend the Federal habeas petition, and we argued that what you have is a bunch of exhausted claims. You don't have the mixed petition that we typically get under Rhines and all of those other cases. So we said, you're staying basically a class of exhausted claims and allowing it to go back to State court. And when we come back, the defendant still or the habeas petitioner is still going to have to amend his claim, and he's going to be untimely. And we said, we argued then under Mayo v. Felix and other cases that you're not going to be able to come back and argue that this relates back. You're not going to be able to say that you're timely to amend your petition. And we argued against it. And we said, you shouldn't do this. The judge did it anyway. The magistrate, when it came back up, he says he's not ruling on the propriety of whether or not that should have happened or not, but the problem that it created for the magistrate is now you've got a 2014 amendment to a 2007 habeas case. So you've got amendments seven years after the fact, and how do you say that this is timely? So the magistrate looked at it, and the magistrate went through and basically analyzed four different ways and said that he cannot find any way that this is timely. And he mentioned equitable tolling. He didn't go into it in great detail, but the equitable tolling argument is basically based on counsel's assertion that he was following, quote, the path laid down for him by the district court. Well, if you look at the record, this path was not laid out for counsel by the district court. Counsel went to the district court. He filed his motion for stay and obey, and he argued that what I need to do is to exhaust my new Cosimini claim by going back to State court. And like you said, over strenuous objection, we had a long argument on it. You can read the argument. I mean, it's 50, 60 pages long. We had a big, long argument over whether or not it was proper to stay a case where all the claims were exhausted and go back to State court to bring up a new claim and the propriety of then amending the petition in some future point to add in the previously unexhausted claim to the court.  And what I argued below — But full notice of what the new — I mean, it's not a case of lack of notice, which is what the whole amendment requirement's for, of amending his pleadings. You knew because that's the whole reason for the stay and the abatement and going to State court, to flesh out these new allegations. So what's the harm to the State? Well, the harm is that you're essentially not following the law at that point. We have a series of law that's laid down. But the law is all about notice in terms of actual prejudice. What prejudice did the State do? No, it's not only about notice, Your Honor. If you look at the cases like Mayo and some of those other cases that follow that, they basically lay out that it's not merely about a notice requirement. It's about complying with the one-year deadline. So the problem that you have here is that even if the State is — Even if it's a one-year deadline. Anyway, but especially if you get to an equitable tolling situation, I think it's all about who's harmed, and I just don't see how the State's harmed in any way. Well, I mean, the argument is always made that the government's not — You had full notice of what the claim was. If you wanted to go get evidence at the time yourself, you were able to. It wasn't going to get stale. But the claim is still untimely. I mean, you're basically finding a way to go around the time bar by saying, oh, well, you knew about — Anyway, that's what tolling's about. But why don't you respond to his comments on sort of the materiality of the Brady material where he says these were the two — there were a number of witnesses. We all know that. He says these were the two most central witnesses on the second part of the interaction. Could I follow up on the one question before I go there? I mean, again, I'm trying to remember the case. I believe it was mail, and I believe it — Justice Ginsburg went through and did a very fine job of explaining that it was more than notice. In fact, you know, she bolded in her opinion the stuff about the notice, saying that you need to bring all your claims, you need to bring them at one time, you need to do it at the — and she referred to rule two of the habeas procedure articles. And she said it's more than just a notice requirement, because it's basically a way to get around the Congress's one-year time limit. And she argued that rule 15 allows some expansion, perhaps, of the timeliness requirements, but it doesn't obviate it. And she says, you know, you can't get around Congress's one-year time limit by coming up with creative — That's a different thing. I think you're right — you may be right that these are two — a new separate filing. I don't dispute that. But then you get into the timeliness for that second filing. And as far as the equitable, to get to equitable, basically you have to show that they were pursuing the claim diligently and that basically some outside agency barred them from pursuing it. The only outside agency in this case that barred them trying to amend their claim in 2010 when we were in court arguing the stay in habeas because Mr. Boren decided he didn't want to do that. There's also a procedure where he could have filed a protective petition in Federal court and then used that to go back and do a stay in habeas. And I believe that's under Slag v. McDaniel and Lundy and all of those cases. There is a procedure in place. He could have done that. He chose not to. He went to the court and he says, this is what I'm opting to do. And he's the one that made that decision. And the courts have repeatedly said that attorney error doesn't get you equitable tolling. Now, had the court said, this is the only way you can do it, and the court had said, you know, I'm going to tell you this is what you need to do, then he would have been under some misapprehension and perhaps, you know, had acted to his detriment. That's what equity is all about, is that you are misled. Just a little of the way that he did, just whether it's merits or cause and prejudice, because your time is running out. The question, Judge Costa, go ahead. You want me to answer this one or go back to Judge Costa? I think it's the same. I'm very interested in your answer on the materiality. On the materiality. On these two witnesses. Okay. Well, again, we're maintaining Cosimini is not before the court. I mean, until you tell us that that has — Address each on the merits. But if you go through Hills, if you look at what Hills said, I think both the state court and the judges, the magistrate judge's argument, he went through and he basically laid out everything that was said in the federal, I mean, in the state appellate court and went through and analyzed how this fight occurred. Basically, there were multiple people fighting. Everybody was involved in it, and the question was, you know, who did what and when, okay? And the state court had no problem saying that Barnes was an active participant. And even if he wasn't an active participant, he was still a principal to Ortego's actions or to Ortego and Brewer's actions. And there was confusion about who was fighting at what point. Mr. Boren argues that it was a two-stage fight. We've always said it was a three-stage fight. I mean, so it depends. You know, the original fight, as they're moving to the car and we get down to the parking lot, and then when they go over the rail, we argue that when they went over the rail, there was some more further kicking and punching and everything else. So as to Hill, what Hill said, I mean, basically every court that's looked at it said that Hill's testimony didn't materially differ from what he said in this taped statement, okay? He said on a couple of occasions that he knew there were three people down there fighting, but he didn't know their names. And on another occasion, I think he mentioned Brewer. So, you know, depending on which version of the statement you're looking at, he either knew there was three people that were doing it and named one or possibly two of them. On another occasion, he said there was three people that were doing it. I don't know their names, but I could identify them for you. Now, I don't know that he was ever subsequently asked to identify them at trial or not, but basically those two statements don't materially differ. He's saying I saw what happened. I saw who was involved, and I know at least one of their names. That's not a materially different statement. And I think, you know, the State Court below found that. As you know, they're entitled to deference. You know, you have to look at that with a different view. The difference is the first time around, he said I saw three people. One of them was Barnes. And then the subsequent statement was there were three people. I'm not sure what their names were. But I can identify them. But I can identify them. And that's the difference of the two statements. As far as I recall, Your Honor. Brewer flipped, right? Yes, sir.  Then Casamimi and Hill, the defendants before the individuals that were looking at the evidence, were there any other eyewitnesses that testified to Barnes being involved in the over-the-rail punching? I can't state that with any certainty. I'd have to go back and look at the record to be absolutely sure. I know I briefed that, and I gave some excerpts from the brief. It was helpful for me to hear the Hill. Can you go ahead and do it with Casamimi on that last paragraph where I asked some questions about materiality? Well, as I recall, and again, you know, we maintain that under Cullen v. Stenholster, we're limited to the record. But as to the Casamimi affidavit, I believe what he said was that he talked to Ms. Barbera, and that she said that since he was a first offender, that she would ask that he get a lighter sentence. Did she say, did his affidavit say she would ask? I thought it was just, as a first offender, you do get a lighter sentence. Let me see. That would be significant. That's right. You don't have to just read it. It would be significant if believed and if it was admissible and if it's not time barred. Well, your version is much more giggly open than what I thought it was. Well, the last paragraph reads, at the time of Lance's death. This is the Casamimi affidavit. I think it's tab 9 of the record excerpt. It says, at the time of Lance's death, I was being dealt with by the courts. I was facing an armed robbery charge. During one of my trips to the courthouse, I was approached by a district attorney, Tracy Barbera. She told me she was grateful for my cooperation with the murder case and I was doing the right thing. She said she wasn't prosecuting my case, but because I was a first-time offender, she could see that I got a lighter sentence. That's what it reads. She could see, but had he already gotten a lighter sentence? I do not know that for a fact, Your Honor. That was handled by a different section of court. And, again, we'd be going off record there for me to speculate what he got, and I hate to speculate, and I do not know. It's not in the record, then? It's certainly not in the state court record or in the federal court record. So how does that differ from what's said at the trial? It's been a while since I read the trial transcript that Cosimini had himself, but I thought that he had been asked if any deals had been made for him. I'm not sure if that was actually asked or not. I seem to recall that, but I could be totally wrong. And he said, probably said, if it was asked, he probably said no? Right. That was my recollection, Your Honor. But, again, I didn't try the case, and it's been a long time since I did the appeal on this and since we haven't actually, you know, litigated the Cosimini affidavit because it's been barred at every state. The difference is that at trial he probably said no deals, and then in the affidavit he says an assistant DA said I might be able to get you a lighter sentence? If that occurred at trial, I guess the other scenario is nobody asked that question at trial, and now he's saying that it happened. And then the question is how is that material? I mean, under case law, if a deal has been made, I mean, you know, that would be something. I mean, I'll be honest with you, that would be something that should be disclosed if a deal has been made, you know. Now, promising to help somebody out, I don't know if that's a deal or not. I guess then we have to get into what the expectation is, you know. But, again, I maintain that this affidavit's not before the Court at this time because this claim has been procedurally barred at this time. Thank you. Thank you. Mr. Boren, what say you? Two things. First, as to the materiality of the Hill statement, the primary thing is that at trial, Mr. Hill says he saw Doug fighting with Lance, and he can identify the other guys, the other two guys, but not by name. In his previous statement that we did not get, he says three or four people jumped on this guy. From what he was told, it was Jake and Douglas Barnes at first, and he thinks David Brewer. So the cross-examination is obvious. Well, who told you that? Amanda did. Okay, Amanda. Bring Amanda in. Amanda, did you tell him that? And Officer Norton, is this what happened in this statement? Did you do any follow-up on that? All of that didn't happen because we were not aware of the existence of that statement. And to me it's just beyond belief. If a prosecutor says to a person, hey, I'd like for you to help me out on this case, thank you for your assistance, and by the way, when it's time for your sentence, since you're a first offender and you've helped us out, I'll see if I can get, I'll see. You think the chronology exists in the record that he hadn't yet been sentenced? Oh, absolutely. That's my belief. And I don't remember the exact sentence he got. It was in his cross-examination of Casamimi. I believe he got seven years on an armed robbery, which carries 99, and he also got a concurrent sentence, as my recollection from the state court, from the federal prosecution for being a felon in possession of a firearm, which means that he had another, he had another. So he was in serious trouble. And it wasn't until years later that he said, after he's no longer under the thumb and he's serving their sentence, that he said that he gave this affidavit, basically recanting his testimony, which I think benefited, of course, that his testimony helped the state. Do we know why he came forward? Why Mr. Casamimi came forward? The hearing, there was a hearing before the magistrate on the procedural objection that this is time-barred. And my memory is that my investigator, Carla Boos, who also worked pro bono, we had heard Mr. Casamimi wanted to talk to us. I did not want to go. Before that, Ortega had tried to get to him. Yes. And it didn't happen. Ortega approaches, gives him a fully affidavit. He says that's a big lie. The government didn't do it. Right. Then you get wind of that and you go to him, and at that point it seems more convoluted. Right. You've got two minutes, 30 seconds on this procedural bar, even with no elaboration. It's impossible. I mean, the explanation of why that's procedurally barred, there is none. The magistrate heard the hearing, heard the testimony. She said this is timely file. This is an appropriate thing for us to do. Four years later, Judge Brady calls up the judge every year or so and says, hey, are you going to make a ruling on the magistrate's report? Four years later, the judge, without a reason, just says I accept. Anderson's decisions four years after that? Yes. Four years after the magistrate had made her opinion, Judge Anderson said, did not accept it and wrote procedural bar. The only explanation for that procedural bar is what the government filed? Yes, and I don't think that and basically, you know, my memory, and I didn't read that part again last night, but my memory is that near the end of the hearing is that the state said, well, okay, you know, we're really not making much of an argument on the diligence here. It's obvious that it, you know, that's what I think. I think they conceded the point. I was stunned when we found, you know. And you had a chance to go up on it. Yes, and then we went to the First Circuit, which said denied, and then we went to the Supreme Court, which said denied, as they did in, you know, half a dozen other cases of innocent people who were ultimately brought up to this court to say, hey, would you please look at this? This is an inconvenient mess for the state that they created by not giving statements to people for decades, and now that their people are finally extracting them, they're saying. Although really technically as to the Casamimi, that isn't. There was no statement they withheld. It's the affidavit he comes up with later. Right, right, and we expected that Casamimi would, you know, say what was in the affidavit if we ever had it, but the affidavit was submitted in support of the motion to show that we had a good faith basis. Would you disagree that there were a lot of other eyewitnesses as to that second or third stage? Yes, there were three eyewitnesses. Babineau said he wasn't sure who hit him. Casamimi said that Barnes was there but didn't hit him, and now recanted that completely, and that was it. Hill wasn't on the other side of the rail. There were only two witnesses, and Brewer, who was there, said that he did not see David hit or kick or strike anybody. So the only witness who said that David hit anybody on the other side of the rail is Casamimi. That's my memory, which is pretty clear from the trial. The case haunts me. A life sentence for a 19-year-old who was involved in a big fight, and my co-counsel Charles St. Dizier is a wise man. He said, you know, the rule is whoever wins the fight goes to jail, and that's what happened. I thank you all. I thank you for granting us oral argument on this case. Thank you. Thank you. A special thank you since you're also court-appointed. We appreciate your assistance to the court. Thank you. Were you court-appointed down on the trial court level? No, I wasn't. Well, I did what I call an accidentally pro bono lawyer at the trial court level. Okay. Thank you very much. That concludes the court's hearings for this week, and we'll be in a